The first case called for oral argument is Illinois Farmers Insurance v. Booten. Counsel, whenever you're ready. Good morning. Good morning. Counsel, may I please report? My name is Dan Worker. I represent Illinois Farmers in this case. It is Farmers' position that the trial court erred in finding that the policy issues were insured in this case was not properly canceled, even though the facts are undisputed that the insurer requested such a cancellation. We believe that the trial court's ruling ignores the manifest weight of evidence in the underlying trial of the matter on that issue. It appears in reading the court's decision, which is at A161 and 162 in the record, that the court mainly focused on the issue of whether or not farmers properly complied with the terms of the policy. And in so holding, the court looked at only the policy provision, which it interpreted as requiring a written request by the insured in order to make the cancellation effective. The Illinois Supreme Court, in looking at cancellation at the request of the insured in the Copley case, recognized that there's two methods by which the policy can be canceled. One is by strict compliance with the policy terms, and the other one is by mutual consent of the parties. On page 86 of that decision, the court held that mutual consent contemplates more than communication by one party to the other. It requires a mutual understanding between the two parties. And I believe that we have that in this case. And if the court finds that there was mutual consent for the cancellation of this policy, the court doesn't even have to consider whether or not there was strict compliance with the policy terms, which I don't believe there was in any event. In this case, the testimony of both parties to the contract, the insured and his agent, his farmer's agent, clearly established that the insured requested cancellation of the policy because his vehicle was inoperable. He gave his car to a mechanic to do some work on the car to see if he could get it working, and during that period of time, an infill was necessary for him to insure the vehicle. He called his agent in October of 2000, and he requested cancellation of the policy. The agent processed the cancellation. A refund of unearned premium was returned to the insured, and the insured acknowledged in direct testimony that he received the check and that he had cashed the check. As a result of that transaction, the farmer's agent, in canceling the policy, put it into the system. He testified at trial. I think the record is pretty clear that all of the computer records generated at the time the request was made, that would be in October 10, 2000, that the records clearly reflect that the policy was taken out of force and canceled at the insured's request. This testimony came in uncontradicted. I mean, the witness testified that the agent testified he had authority to cancel the policy. That was a role that he was given authority by farmers to do, and that was undisputed. Now, that sequence of events alone clearly establishes the mutual consent that was considered incapably as an effective method by which to cancel the policies. The fact that there is no issue between the two parties of the contract and that there was this mutual consent, and the insured acknowledges that fact and clearly establishes that the policy was properly canceled, it was not in effect on October 16, six days later, when an accident occurred, when the vehicle was being driven by the person he gave the car to to fix. Now, there were some issues in the trial court made with regard to subsequent letters issued by farmers in 2001. Those letters occurred in June of 2001, and they were two separate letters. During the course of the trial, the authors of those letters were never brought in to testify as to the content. The two people that testified in the trial for farmers, Duffy, Ed Duffy, and the agent, and Mike Covey, actually, the claims representative, those three people weren't able to authenticate those letters. They didn't know why they were generated. They don't know where they came from, and objections as to the admission of those records. The discussion in the trial court, this court should keep in mind, was done at cross-examination during the plaintiff's case in chief. When the defendant sought to enter those letters into evidence in their case in chief, there was an objection to the admission of the records, and the objection was overruled, and the court considered them in the decision. All right. Now, let me ask, there was discovery taken prior to this trial. Is that correct? My understanding, yes. Yeah. And, in other words, there was an attempt made by the defendant to determine where these letters came from. I don't know what the nature and level of attempts that were made to gather that testimony. It was certainly a letter, the particular letter was one generated from the insurance company, from Farmers Insurance. Yes. But everybody that was deposed or questioned about it from Farmers Insurance said they didn't know where it came from. Right. So what's a person to do if nobody in the company can determine where a letter that clearly came from the company? Well, there was no subpoena under our Supreme Court rules asking for the person most knowledgeable about the generation of those records to come in and testify as to what those records entail. Wouldn't it be admissible as an admission? It wasn't sought under those grounds, Your Honor. It was objected to as hearsay because they were looking to – That doesn't answer my question. Wouldn't it be admissible as an admission? If the party that drafted the letter admitted that the contents of the letter were true, yes. But there was no foundation for the generation of the letter. Right. And even if the court considers the letter – Okay. I thought you just agreed with me that this was clearly a letter generated by the Illinois Farmers Insurance Company. It was generated by an employee of Illinois Farmers Insurance, correct. Which said that the policy was in effect at a certain time. I don't remember the exact language, but it – Right. The letter was generated some seven months, actually eight months, after the policy was canceled to a request with a third party concerning whether or not the policy was in effect. Actually, there were two letters. One generated by the claims representative at Farmers Rent and Tax clearly testifies that the policy was out of force on the date of the accident. The reason was incorrect. You know, it indicated that it was canceled for non-payment of premium, but still attested to the fact that the policy was not in force nonetheless. So what, you had those contradictory statements from the plaintiff, Illinois Farmers Insurance Company, about whether the policy was in effect at that time? Eight months after the accident, and the evidence that was introduced on that issue was uncontradicted. For the parties that testified on behalf of the representatives of Farmers Insurance, they verified by overwhelming evidence in that case. The computer records, the agent's direct testimony of his communications with the insurer, the agent's testimony concerning his activities when he canceled the policy. And all those activities took place at or near the time that the cancellation took place. The letters that were introduced over objection occurred in June of 2001, you know, related to a request from the state concerning whether or not this person was insured. And Mr. Robertson was insured by Farmers at the time in June of 2001. He was not insured for this vehicle in question that was involved in this accident. He had another car, another policy that was issued by Farmers for a NIA. So whether or not the letter was accurate, the contents of the letter, it was impossible to explore because witnesses were not available to testify at trial concerning those issues. And I believe that's what the objection was, part of admission and consideration of the evidence. And if the court looks at the admission of business records for the truth of the matter asserted to overcome the hearsay rule, they have to have somebody that lays the proper foundation for the business record itself and to establish that the contents of the letter were true and accurate and made at or near the time of the occurrence in question. Here again, the amendment occurred some eight months after this policy was canceled at the request of the insurer. Based on all of the evidence that's in the trial and the fact that the information contained in the letter could not be explained or discussed because it was improperly introduced into the trial, we believe that it should not be considered by this court. And the totality of the record clearly establishes that both the insured and the insurance company had a mutual understanding as of October 10, 2000, that he was no longer insured under that policy. The policy itself, you know, there's an issue as to whether or not it's written request by the insured is the only manner of method in which the policy could be canceled. I think if the court looks at the language of the policy, it says that the insured may cancel it in writing. It doesn't say that it has to be done that way. And there's a distinction between may and shall when it's used in either statutory construction or policy construction. There again, I mean, strictly from English, I mean, looking at that sentence, may would seem to me to modify cancel. And then after that, the next phrase tells you how you cancel if you choose to cancel. And that's by doing it in writing. Having a little trouble with your construction of the sentence. When you consider the sentence as a whole, when you read the sentence as a whole, the insured may cancel the policy in writing. It doesn't say that's the only method by which the insured can cancel. Yeah. It says may cancel policy by advising in writing. Right. That's one method in which the insured can cancel the policy. And I think Copley supports the fact that the insured can cancel the policy in any way that they choose. I mean, it would be a bad policy for this court to find that an insured could not cancel the policy, but for a written request to an insurance company. If the insured wants to get out of his contract and wants to refund a premium, they should be able to do that in any manner that's acceptable to the insurance company. So you would interpret the sentence to mean they could cancel the policy by text message? I believe so, yes. Or voice mail? Any manner. Nailing a note on the door of any felony farmers insurance company office? Right. If they can show that the request to cancel was effectively communicated to the insurance company, I believe at that point in time they could argue effectively under our case law that the cancellation was effective and that they would be entitled to a refund of any under-earned premium from that date forward. Okay. Unless there's any questions from the panel. I don't think so. Thank you, counsel. Counsel? Police and court. My name is Ted Hampson. I represent the Boots in this case. We believe that the trial court did consider mutual consent, even though it wasn't even addressed by the trial counsel for the claim. Specifically, at no point in the record did they ever say this was canceled by mutual consent. In fact, their reconsideration focused solely on explaining the language in the contract because the cancellation was based upon policy. We believe that the court evaluated all the evidence in the light of mutual consent, determined it did not exist, and therefore fell back to policy provisions in order to determine it was an ineffective cancellation. We think that this claimant gives a lot of weight to the testimony of Larry Keegan. Larry Keegan is a bound agent. He is not a representative of the company. He admits in the testimony he has no authority regarding policy or coverage decisions. He can't even bind coverage unless it's authorized by the underwriter. We believe that his testimony, although it tells what he believes occurred, is not necessarily sufficient to determine what the company determined had occurred, which is why you get this letter when somebody actually asks for the first time, the company, is there coverage? By the way, the letter in question specifically says the data lost $1062,000, not the coverage at the time of your request in 2001. The first time they asked the company if there's coverage, they said, oh, yes, there's coverage. He had coverage at that time. That set off an investigation in which Larry Keegan received a copy of this letter. He's an agent who apparently couldn't determine where this came from. Apparently, he was able to call and get the correct department and ask the author of the letter what this was all about. That's in his testimony directly. He's a plaintiff's case of chief, by the way. And he was able to inquire and say, well, I thought that this was canceled. He calls his claims office, Mr. Goetz. They initiated an investigation, and thus Mr. Goetz's letter in 2001. I think that letter, June 26th of 2001, issued by Raymond Goetz, the authorized coverage agent for pharmacy insurance, is very important in this case because the trial court specifically mentions it. In that letter, he says, this policy is out of course due to non-obtainable. The trial court didn't particularly care for that because he's saying, oh, wait a minute. You're telling me you canceled this by mutual consent. You acknowledged this coverage on June 4th of 2001 to the Department of Transportation, which, by the way, they never sent a second letter of correction to the Department of Transportation. And now, in 2006, after your investigation, you think it's out of course due to non-obtainable. You didn't even come to the conclusion that it was out of course due to mutual cancellation. It's directly in the trial court's order just in reference to that. I think the trial court's point is the burden is on you, Mr. Insurance Company, to prove to me mutual consent. Mutual consent is a common law method of cancellation. Cancellation requires, in my opinion, specific steps to show that there is cancellation. Otherwise, what's the point of this lengthy contract that they're putting together with all the terms, qualifications, requirements, as far as arguing each other this contract? Fine, you can cancel by mutual consent, but it needs to be clear and unequivocal that that is what you intended to do. And when these letters came out directly from the company itself, I think the trial court found the problem with that. It questioned mutual consent. The company was writing letters in reference to an official request from the Department of Transportation regarding coverage unrelated to a suspension. And they're affirming that, the company is, that how could there have been a mutual consent at the time that this request was requested, or this cancellation was requested from Mr. Robinson? I think that's what the trial court struggled with on the issue of mutual consent. And so the trial court said, if there's no mutual consent, we have to consider the language of the policy, and I agree with the Justice, that the language is unambiguous and clear. There is only one method by which to cancel this policy. The language is very specific, made, obviously refers to the word cancel, so you have the ability or the opportunity to cancel the policy by doing so in writing, to suggest that they created this lengthy insurance contract in order to lead anyone's best guess to how other forms of cancellations could be completed is ridiculous. As a matter of fact, cited in our case, they're required by statute to any insurance company who offers insurance policies stated L1 must set out in writing the cancellation provisions in the policy. That's cited in my brief. So he's suggesting that, well, we just had to write one to be in compliance with the statute, and we'll just leave it open as to the remaining methods by which cancellation can occur. I disagree. And, again, they're pursuing cancellation under mutual consent, which is created by common law. Yet they're also trying to say, well, it also falls under the terms of the contract. I think that's inconsistent as far as the statement is concerned. But the point that we're specifically trying to make is that if you have a situation in which the trial court has the opportunity to review all the evidence that was heard in this case, there's no dispute that there was evidence that was not considered or unheard. The trial court sits there and hears the credibility of witnesses and looks for the facts that were heard and then makes a determination that it's an ineffective cancellation. There is no evidence to suggest that the trial court didn't consider mutual consent. As a matter of fact, we make our argument in a brief that there seems to be more evidence based upon what he specifically wrote in order that he did consider mutual consent, although he didn't put it in writing that day. And that it seems clear that the trial court found this, the absence of the written refusal or the written cancellation, to run afoul of contract provisions and, therefore, found the cancellation ineffective. The issue regarding the admissibility of the documents, I think there's no question that these documents were brought out through discovery. There were several depositions to determine the authors of these, as well as subpoenas to the division that is responsible for the production of documents at the request of trial counsel. There's no question that there was every effort to determine the authors. But you also have to consider that Larry Keegan was able to find the author according to his testimony at trial. He knew who to call. He discussed the contents, meaning he received this document, understood what it meant and what it was sent for, discussed it with him generally to find out why it was sent, proceeded to go up the chain to determine why this was done, initiated an investigation to determine. It's difficult to argue that the departments didn't understand the contents or what they were saying in this letter or where it came from. As a matter of fact, Patricia Douglas' deposition was, she explained quite a bit about where these documents come from from the standpoint of what Farmers does when they receive this request, where they come from, why they're generated. So it suggests that Farmers has no idea where this document comes from. I don't agree with it. As a matter of fact, the business exception case law that I cited specifically states that you're assuming that businesses are motivated to keep records accurately and are unlikely to falsify records upon which they depend. There's been no allegation that this is a falsified record or that it isn't a record that came from Farmers Insurance. So to suggest this, it's not an admission of war. Quite frankly, this document, both these documents were introduced by the plaintiffs, put at issue by the plaintiffs in their case in chief, in this trial, both through Keegan and through Patricia Douglas and through Mr. Covey. And yet, at the end of the trial, they don't want the court to consider the very document that they put at issue when they were proceeding on the verdict. I think it's suspect to suggest that it would not be fair grounds for the purposes of the trial. In fact, the trial court cut the trial counsel for the defendant off when we were arguing the basis of non-admittedness over the objection of the plaintiff. There was no argument that the trial court related to the misdemeanor's document. The trial court made a summary determination. And that issue was never raised in the motion to reconsider. It wasn't even touched in the motion to reconsider. So if it was such a glaring omission by the trial court, it should have been in the motion to reconsider. Otherwise, it doesn't have to be. But you would think if that was such a glaring omission, it would have been brought up again in the motion to reconsider. To make the long story short, I guess, we think the trial court made the proper conclusion on the issue of contract discussion. We believe the standard of view is to know that the courts are certainly going to determine what they feel that provision of the contract means. We've made our arguments there. As to the issue of manifest or mutual consent, obviously, that's the manifest way to break deference is typically granted to the trial court's decision as to facts. And on the issue of the admissibility of this letter, that falls under the decent discretion standard. And quite frankly, whether the admissibility of the document is usually fairly low because the trial court is still granted the opportunity to grant whatever weight they wish to that document. In this case, the court granted great weight to it. And it would have been figured into its decision. But the point is, even if it comes in, the court trial court still has the opportunity to grant it a weight that determines that there wasn't sufficient evidence to support what we have argued that this document was to do. Unless there's any additional questions on it. I don't believe we do. Thank you. Thank you, counsel. Counsel? Thank you. Mr. Worker, do you believe that you would be in compliance with the policy if you texted the insured and said we're canceling the policy? The statute that counsel referred to protects the insured for unilateral termination of the policy by the insurance company. And the purpose of that statute is to give the insured notice of the cancellation under the terms of the statute. So to answer your question, if a text message is not called for in the policy, farmers would be unable to unilaterally terminate the policy by text message. And that's pursuant to statute. Correct. But looking at the language of the contract, they seem to be very similar, number one and number two. Right. As far as the duties. Right. Farmers' policy in terms of their unilateral cancellation of the policy tracks the statute almost identically. You know, that's not the issue here, though. The issue is here what the insured can do in terms of canceling their policy. And counsel raised an issue as to whether or not the agent himself had authority to do that and to find farmers in accepting the cancellation. And I think if the court looks at page 39 of the record, the agent clearly testified that he had that authority. He was asked a question as to whether or not he was farmer's agent, and he responded, yes, sir. Can you find coverage for one of your clients? His answer was yes. Through the computer, if your underwriter accepts it, you're able to find coverage, correct? His answer is yes. You're able to cancel coverage at the request of insurers, correct? His answer was yes, sir. And that's, in fact, what you did for Gary Robertson, correct? Yes, I did. That testimony is undisputed in this case. He had the authority to accept the cancellation on behalf of the insurer. So I think when you look at the parties, Gary Robertson, his testimony is uncontradicted, that he actually requested the cancellation and received it from farmer's agents that had authority to do so. There were no witnesses brought in to contest whether or not he had the authority to accept the cancellation on behalf of his principal farmer's insurance. With regard to Exhibit 13, Your Honor asked me a question as to whether or not it constituted an admission. In the Babbage case, a letter from Toyota was sought to be admitted into evidence as to when they purchased a chair to avoid a statute of limitations issue. And there was some information in that letter that indicated that the chair was purchased some eight years before the incident, not ten years. They sought to admit that record into evidence as an admission under the business record exception for hearsay. And the court in that case said that it was not a proper admission under the business record exception because the person, the witness, could not authenticate the document or its content with regard to whether or not it was made in the regular course of business and whether or not it was made at or near the time of the occurrence. So in order to establish an admission in the case on behalf of farmers pursuant to the letter, counsel would need to bring in at least a custodian of records or somebody that could testify as to the authenticity of that record, and that wasn't done in this case. There were reasons in the record why that error could occur by somebody in a different department that verified to the state that insurance was in effect for Gary Robertson because, as I said, there was testimony introduced at the trial that Mr. Robertson in fact had another policy with farmers. So testimony was introduced basically speculating on how this could have happened without anybody ever acknowledging that they're the ones who wrote it? Well, that's also the point of not arguing the contents of that letter as an admission because the person that authored the letter was not brought into court to explain what the thought process was, where they got the information, because there is nothing contained in the record to substantiate that the coverage was in fact in place on October 10, 2000. Did farmers deny that they produced that letter? I don't know if there was a request made to farmers in the underlying case. There's clearly nothing in the record that was ever asked of farmers whether or not it was generated by them. In fact, the witnesses that testified in the case were unaware of who the author was or where it came from, and that is what the testimony is. I think it would be improper to consider the contents of that record as an admission without laying the proper foundation for its admission into the record. The objection was properly made, and when counsel says that farmers introduced the information in its case in chief, that clearly is not the case. It was done through cross-examination through counsel without first admitting the record into MS. And when he attempted to do so, the objection was properly made, and it should have been excluded. Thank you, counsel. We appreciate the briefs and arguments, and counsel will take the case under advisement.